UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


SHERI RISER,

                Plaintiff,                             Civil Action No. 2:13-11135

      v.                                     District Judge Gerald E. Rosen
                                                    Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/


**REPORT AND RECOMMENDATION TO**
**GRANT IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [12] AND**
**DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [14]**

On May 12, 2009, Plaintiff Sheri Riser was riding in the front of a bus when it rear-ended a semi-truck, causing Riser to be thrown to the floor. At the emergency room, Riser complained only of left-arm and left-knee pain, which were diagnosed as contusions. Due to insurance issues, Riser could not obtain a cervical-spine MRI until a few months after the accident; when it was finally taken, it showed herniated disks. When her neck, lower-back, knee, and shoulder pain had not resolved despite medication, physical therapy, and chiropractic treatment, Riser, who also suffers from depression, applied for social security disability insurance benefits and supplemental security income. An administrative law judge ("ALJ"), acting on behalf of Defendant Commissioner of Social Security, concluded that Riser was not disabled. Riser filed this suit to challenge that decision. Now before the Court for a report and recommendation (Dkt. 3) are the parties' cross-motions for summary judgment (Dkts. 12, 14). Because the Court agrees with Riser that the ALJ erred in assessing her credibility, and because the ALJ's errors are not harmless, this Court

RECOMMENDS that this case be REMANDED for an ALJ to reassess Riser's credibility.

## I. BACKGROUND

### A. Chiropractic Treatment

For the first several months following the May 2009 accident, Riser received frequent chiropractic treatment from Michael Meeron, D.C. (Tr. 228-47; *see also* Tr. 220, 228.) A week after the accident, Meeron diagnosed Riser with a severe cervical sprain (with myositis and radiculopathy), a moderate dorsal sprain (with myositis), and a severe lumbar sprain (with myositis and radiculopathy). (Tr. 247.) Later in May, Meeron noted: "The patient does describe mild improvement following initial treatment. It was temporary however." (Tr. 244.) He advised Riser to abstain from "household, occupational, or recreational type activities" and from "bending, lifting, twisting, pushing, pulling, prolonged sitting or standing." (*Id.*) In June 2009, Riser experienced "overall subjective and objective improvement. The cervical spine [has] increase[d] range of motion – minus 35; lumbar spine – minus 40. Cervical spasms are moderate to moderate plus. Lumbar spasms are moderate." (Tr. 241.)

In July 2009, Meeron referred Riser "for diagnostic testing to evaluate the integrity of the lumbar spine," but Riser was "unable to comply with these recommendations due to [a] dispute [with] the insurance carrier." (Tr. 241.) Later that month, Meeron remarked, "She continues to face obstacles with regards to insurance benefits. I do feel she would benefit from diagnostic testing as previously noted. . . ." (Tr. 239.)

In early August 2009, Riser reported significant "left knee pain, left arm pain, as well as arm and hand numbness." (Tr. 238.) Meeron remarked, "I am concerned there could be a disc pathology present in the cervical area, as well as the low back. I will attempt once I receive insurance

information to obtain an MRI of the cervical spine to rule out disc pathology." (*Id.*)

Riser was finally able to undergo a cervical-spine MRI in late August 2009. (Tr. 248-49.) The radiologist's impression was herniated disks at C4-5, C5-6, and T1-2, and "reversal of the cervical lordotic curve consistent with cervical muscular spasm." (Tr. 249.) More specifically, the study revealed central disc herniation at C4-5 "producing impingement on the ventral cord surface." (Tr. 248.)[1] Upon reviewing the MRI report, Meeron wrote, "The patient will be referred for Neurosurgical consultation. MRI report indicates impingement of the ventral cord surface at the C4/C5 level. I do feel it is essential that the patient have consultation." (Tr. 238.) Primarily because of insurance problems, however, Riser did not see a neurosurgeon for another few months. Meanwhile, Meeron continued to treat Riser every few days. (Tr. 232, 235.)

Toward the end of 2009, Riser finally saw a neurosurgeon: Dr. Fernando Diaz at the Michigan Head & Spine Institute. (Tr. 232; *see also* Tr. 203.) Meeron was also able to refer Riser to Dr. Stephen Mendelson, an orthopedic surgeon. (*See* Tr. 288.)

## B. Diagnostic Testing, Medication, Physical Therapy, and Application for Social Security

Riser first saw Dr. Mendelson in November 2009. (*See* Tr. 288.) He noted that x-rays of Riser's knees were negative for arthritis. (Tr. 288.) On exam, Riser had knee "pain at her joint lines." (*Id.*) Her knee was "stable," but Riser "winced" during varus and valgus stress testing. (*Id.*)

---

[1]"In the center of each vertebra is a large opening, called the spinal canal, through which the spinal cord and nerves pass." The Cleveland Clinic, *Health Library: The Structure and Function of a Health Spine*, http://goo.gl/IFJ41d (last visited Jan. 16, 2014). "As the spinal cord runs through the spinal canal, it branches off into 31 pairs of nerve roots, which then branch out into nerves that travel to the rest of the body. The nerve roots leave the spinal cord through openings called neural foramen, which are found between the vertebrae on both sides of the spine. The nerves of the cervical spine control the upper chest and arms. The nerves of the thoracic spine control the chest and abdomen, and the nerves of the lumbar spine control the legs, bowel, and bladder." *Id.*

In December 2009, Dr. Mendelson noted that a physician had interpreted an MRI of Riser's knee as normal. (Tr. 287.) Yet, on exam, Riser was "exquisitively [*sic*] tender at her patella tendon and in her kneecap regions." (*Id.*) Dr. Mendelson provided, "I have reviewed the MRI myself. It does show a significant amount of swelling in the prepatellar bursal region." (*Id.*) He diagnosed "knee contusion" and prescribed physical therapy. (*Id.*)

In January 2010, on referral from Dr. Diaz, Riser had the first of several appointments with Dr. Sophia Grias, a physiatrist who also worked at the Michigan Head & Spine Institute. (Tr. 206; *see also* Tr. 203.) Regarding her neck, Riser explained that her pain radiated into her shoulder then down into her arm with occasional tingling in her hand. (Tr. 203.) Dr. Grias noted that an EMG study had been negative, but that an MRI showed herniated discs and reversal of the lordotic curve. (*Id.*) Regarding her lower back, Riser said that sitting too long, standing up, or bending over caused pain. (*Id.*) Dr. Grias, apparently referring to an imaging study, noted that Riser had "L4-5 disc herniation with a mild L5 radiculopathy on the left." (*Id.*) Dr. Grias further noted, "[Ms. Riser] is independent in basic and light advanced [activities of daily living ("ADLs")]. Her older son and her younger son help with heavier advanced ADLs. She is not driving." (Tr. 204.)

Upon examination, Dr. Grias found that although Riser's neck had a "functional" range of motion, she was "very stiff with her motions with pain at the extremes in all planes." (*Id.*) As for her shoulder, Riser could not rotate her arm completely and could abduct it to only about 90 degrees. (Tr. 204.) But Riser exhibited four-out-of-five strength in her shoulder. (*Id.*) Regarding her left knee, Riser was able to extend her lower leg completely, but her knee flexion was "limited with pain"; her knee also had some swelling. (Tr. 204.) Dr. Grias planned for Riser to start physical therapy for her neck, ordered an MRI for her shoulder, and wanted to obtain the MRI of Riser's knee from Dr.

4

Mendelson. (Tr. 204-05.)[2]

An MRI was performed on Riser's shoulder about two weeks later. (Tr. 216-17.) It revealed "supraspinatus tendinitis with superimposed partial thickness tear along the undersurface of the tendon." (Tr. 217.) The radiologist also noted, "AC joint hypertrophy with mild impingement." (Tr. 217.)

When Riser saw Dr. Grias in February 2010, Riser reported that her physical therapy had thus far focused on her knee (as opposed to her neck), and that, while the range of motion in her knee had increased, she was still having a lot of knee pain. (Tr. 200.) Riser was taking Voltaren and Tramadol for break-though pain but reported that the Tramadol was not helping. (*Id.*) Dr. Grias noted that Riser was also taking amitriptyline at bedtime, which helped Riser sleep "for [a] few hours" before she woke in pain. (*Id.*)

Riser saw Dr. Mendelson twice in March 2010. (Tr. 285-86.) At the first visit, Dr. Mendelson took an ultrasound of Riser's shoulder which confirmed a partially torn supraspinatus. (Tr. 286.) He provided a shoulder injection and prescribed Dendracin cream (a topical analgesic), Mobic (an anti-inflammatory), and Flexeril (a muscle relaxant). (*Id.*) About two weeks later, Dr. Mendelson noted that Riser "got some relief" from the shoulder injection. (Tr. 285.) Riser's knee "continu[ed] to hurt her." (Tr. 285.) Dr. Mendelson prescribed a Medrol Dosepak (Tr. 285): a corticosteroid hormone that "decreases [the] immune system's response to various diseases to reduce symptoms such as swelling, pain, and allergic-type reactions," WebMD, *Medrol (Pak) Oral*, http://goo.gl/9iGQKI.

---

[2]Dr. Grias referenced "Dr. Kornblum" a physician in the same office as Dr. Mendelson. The record, however, reflects that it was Dr. Mendelson who treated Riser.

5

Meanwhile, Riser continued with physical therapy and chiropractic treatment with modest results. In March 2010, one of Riser's physical therapists noted, "[patient] rates [increased] movement in her neck and tol[erance] for sitting. [Patient] cont[inues] to [complain of] marked difficulty [with] overhead ADL's and resisted ADL's. [Patient] has limited mobility [with] looking up." (Tr. 272.) Riser reported pain at the eight- to nine-out-of-ten level. (Tr. 272.) In April 2010, Meeron reevaluated Riser: "Cervical spine – minus 15. Lumbar spine – minus 15. Lumbar spasms are mild. Cervical spasms are mild to mild plus." (Tr. 229.) Bechterew's test (lumbar spine) and cervical distraction and Soto-Hall tests (cervical spine) were positive, however. (*Id.*) On April 23, Riser told one of her therapists that her knee symptoms had improved 50% from the initial evaluation such that she could stand or walk for 15 to 30 minutes without pain. (Tr. 278.) The therapist noted, "[patient] states that she has been able to walk [and] stand for longer periods of time. Able to go [up and down] steps only [one] at a time but [with less difficulty] and she notices [decreased] swelling." (Tr. 278.) About a week later, however, one of Riser's therapists provided "re-assessment completed. [Patient] cont[inues] [with] suprapatellar swelling [and] pain limiting her function." (Tr. 277.) Around this time, Riser reported a 30% improvement in her "cervical/thoracic" symptoms since her initial evaluation. (Tr. 275.) The therapist also noted that she was "now able to get a gallon of milk out." (*Id.*) Still, Riser said her pain was a seven (out of ten) with the help of medications and an eight without them. (Tr. 275.) In early May 2010, Riser reported that she continued to have "pain/swelling" in her knee and that she was back to wearing her knee brace most of the day. (Tr. 276.)

On April 12, 2010, 11 months after the bus accident, Riser, then 43 years old, applied for social security disability insurance benefits and supplemental security income. (Tr. 14, 127-40.)

Riser also saw Dr. Grias in April 2010. (Tr. 197-99.) Dr. Grias noted that the Medrol Dosepak "seemed to help," but when "the pack finished after [a] few days, the pain returned." (Tr. 197.) Dr. Grias also noted that Riser was taking a higher dosage of Darvocet than she had prescribed, but Riser reported that the pain reliever was helping. (*Id.*) On exam, Riser's neck range of motion was functional, but she had pain on rotation. (Tr. 198.) Riser did not have full active range of motion in her left arm, but Dr. Grias "could range it to full with pain." (*Id.*)  Riser had four-out-of-five strength in her left shoulder. (Tr. 198.) As for her left knee, Dr. Grias observed "[n]o significant edema," but Riser did have pain on flexion and extension. (*Id.*) Dr. Grias provided that Riser could continue taking the higher dosage of Darvocet and should continue physical therapy. (*Id.*)

At her May 2010 appointment with Dr. Mendelson, Riser reported that her knee had been extremely painful. (Tr. 284.) "She has been trying in therapy but it has not been successful for her." (*Id.*) Dr. Mendelson examined Riser: "She can range the knee but she does guard. It makes it difficult to do a full exam . . . . Her shoulder is diffuse[]ly tender in multiple different areas." (*Id.*) Although Riser's prior left-knee MRI was negative, because it was a "non-contrast" study, Dr. Mendelson recommended an MRI arthrogram. (*Id.*)

In June 2010, Riser provided Dr. Grias with an update on the status of her back, shoulder, and knee. (Tr. 310-11.) Riser said she still had neck pain that radiated to her shoulder with occasional numbness and tingling in her hands. (Tr. 310.) She was still seeing her chiropractor for her lower back and it was "better than it had been in the past." (*Id.*) Shoulder pain persisted, "especially with overhead movements." (*Id.*) As for Riser's knee, Dr. Grias wrote, "The more therapy she has done, the more pain that she has been in . . . . Now, she feels she cannot take her

7

brace off at all." (*Id.*) On exam, Dr. Grias found that Riser had a "functional" range of motion with her neck, but had pain when rotating her head to the left and "myofascial trigger points [i.e,. highly sensitive areas] at her cervical paraspinals and trapezius." (Tr. 311.) The physiatrist recommended the following treatment: "She will stop [physical therapy for her neck] and continue her exercises on her own since she has reached [a] plateau. She should follow up with Dr. Diaz. We will increase her Vicodin HP one tablet [orally three times daily.] She will continue on the Neurontin." (Tr. 311.)

Riser also saw Dr. Mendelson in June 2010. (Tr. 296.) His plan:

> With regards to the knee, I am going to prescribe and dispense an Interferential unit [i.e., an electrical stimulator] to her today.
>
> With regards to the shoulder, I do think that at some point she will come to an arthroscopic evaluation and treatment of her shoulder.
>
> She is seeing Dr. Diaz. I would recommend to her that if she required any surgical interventions of her neck that I would recommend that she have that prior to my shoulder surgery. I will see her back in the office in three weeks' time.

(Tr. 296 (paragraphing altered).)

### C. Left Shoulder Surgery, Recommended Cervical Spine Surgery, and Initial Denial of Riser's Applications for Social Security

In July 2010, Riser returned to Dr. Diaz. (Tr. 313-15.) The neurosurgeon noted that Riser "had gone through physical therapy, medication, injections, and exercise without resolution of her symptoms." (Tr. 313.) On exam, Riser exhibited a decreased range of motion in her cervical spine and moderate muscle spasm around her spine. (*Id.*) Dr. Diaz also reviewed the August 2009 MRI of Riser's cervical spine. (*Id.*) He concluded, "I believe Ms. Riser has herniated discs at C4-C5, C5-C6, and T1-T2 and a left supraspinatus tendon partial tear, which are the direct result of the motor vehicle accident of 05/12/09. I have recommended she should have a repeat MRI scan of her

8

neck and she should see Dr. Mendelson, her orthopedist[,] for evaluation regarding her left shoulder." (Tr. 315.) Riser was to return in three weeks. (*Id.*)

In the interim, Riser underwent the "repeat" MRI of her cervical spine. (Tr. 316-17.) The radiologist's impression was herniation at C3-4 with "mild" bilateral foraminal stenosis, herniation at C4-5 with "mild" canal and left foraminal stenosis, herniation at C5-6 "with canal and left-sided foraminal stenosis," and "less than 2 mm central subligamentous herniaton at T1-2." (Tr. 317.)

On August 2, 2010, Riser saw both Dr. Mendelson and Dr. Diaz. (Tr. 319-21, 346.) Riser told Dr. Mendelson that she still had pain in her neck that radiated into her shoulder. (Tr. 346.) She also reported knee pain at the eight-out-of-ten level. (*Id.*) Dr. Mendelson reviewed the MRI arthrogram of Riser's knee and noted that it showed "[n]o intraarticular pathology." (*Id.*) His plan: "Again I am going to recommend that she pursue whatever surgical treatment is needed with Dr. Diaz first. It may be that some of her pain is really referred from her neck." (Tr. 346.) The very same day, Dr. Diaz noted, "She Saw Dr. Mendelson who recommended the surgical treatment for her left shoulder, but wanted to wait until he heard about what we could do for her neck." (Tr. 319.) He opined, "I believe Ms. Riser would benefit from a radical anterior discectomy with arthrodesis and instrumentation at C5-C6, but she is not interested in pursuing surgery. I believe she may go through the surgery for her left shoulder with Dr. Mendelson and then return to see me when she is ready for surgery for her neck." (Tr. 321.)

On August 18, 2010, Belinda Singleton, a disability adjudicator at the initial disability determination level, completed a pair of Disability Determination and Explanation forms corresponding to Riser's disability insurance benefits and supplemental security income applications. (Tr. 53-78.) A section of the forms titled "Residual Functional Capacity" is signed by

9

Tariq Mahmood, M.D. (Tr. 60-61, 73-74.) Dr. Mahmood opined that Riser could perform the exertional demands of "light" work but had postural and reaching limitations. (Tr. 60.) Based in part on Dr. Mahmood's assessment, Singleton concluded that Riser was not disabled within the meaning of the Social Security Act. (Tr. 51-52.) In September 2010, Riser requested de novo review of her applications by an administrative law judge. (Tr. 12.)

Also in September 2010, Riser returned to Dr. Grias. (Tr. 324-26.) She noted that Riser's neck pain was "still bother[ing] her." (Tr. 324.) Dr. Grias also remarked, "She is able to turn it. She does do her stretches on her own, but it is very stiff, especially at the extremes and when she wakes up in the morning. She has difficulty sleeping at night even with amitriptyline." (Tr. 324.) Following an exam which revealed neck pain upon rotation and extension, Dr. Grias provided the following plan: "She will continue her exercises that she learned in PT on her own. Dr. Diaz did recommend surgery, but she is holding off for now since she is getting her shoulder done. She will continue on the Neurontin. I did give her samples of Amrix, which she can take at night as a muscle relaxer. She may use her stimulator unit." (Tr. 325.)

In October 2010, Riser underwent shoulder surgery: extensive debridement, complete synovectomy, repair of a superior labral tear, acromioclavicular joint resection, acromioplasty, and an arthroscopic rotator cuff repair. (Tr. 341; *see also* Tr. 342-43.)

At the end of October, Dr. Diaz completed an "Attending Physician's Report." (Tr. 328.) In his report, Dr. Diaz identified the following diagnoses and conditions: "displacement cervical disc [without] myelopathy/discectomy (to be scheduled) herniated disc C3-C4, C4-C5 and C5-C6 (largest at C5-C6)." (Tr. 328.) He opined that Riser had been disabled since the date of her accident. (Tr. 328.) In response to a question about when Riser "should be able to return to work," Dr. Diaz wrote,

10

"To be determined after pending surgery." (*Id.*)

When Riser saw Dr. Mendelson in December 2010, the orthopedic surgeon noted that Riser had been "working hard in physical therapy." (Tr. 337.) Riser reported "some pain relief after surgery," but that her shoulder pain was still at the seven-out-of-ten level. (*Id.*)

In late 2010 or early-to-mid 2011, Riser completed a questionnaire about her shoulder provided by Dr. Mendelson's office. (Tr. 333.)[3] She indicated that her shoulder pain was at the five-out-of-ten level, and that pain caused her to wake at night. (*Id.*) In response to a question asking Riser to identify activities she could not perform from a list of ten activities, Riser selected: "[r]each high shelf," "[w]ash back," "[f]asten bra in back," "[p]erform usual sports," "[p]erform usual work," and "sleep on your painful side." (*Id.*) She did not, however, select "lift [greater than] 10 [pounds] over shoulder." (*Id.*)

Riser saw Dr. Mendelson in February and March 2011. In February, Riser continued to report knee pain; she was using her brace, which helped. (Tr. 331.) As for her shoulder, Dr. Mendelson thought Riser was "making good progress" and wanted her to "continue in therapy." (Tr. 331.) Riser was to return in a month, at which time Dr. Mendelson would perform a knee injection. (*Id.*) As planned, Dr. Mendelson provided Riser with a knee injection in March. (Tr. 329.)

### D. The Administrative Hearing

As noted, following the denial of her social-security applications at the initial review level, Riser requested a hearing before an administrative law judge. (Tr. 12.) That request was granted, and on June 20, 2011, Riser appeared and testified about her impairments before Administrative Law

---

[3]The document is not dated but Riser indicated on the form that she was 44 years old and that she had undergone shoulder surgery. (Tr. 333.) Those two facts imply that the form was completed sometime between her October 2010 surgery and her 45th birthday in April 2011.

Judge Raymond L. Souza. (Tr. 24-48.)

The ALJ asked Riser about her pain. (Tr. 38.) He explained that "one" corresponded to "no problems, like when you're sixteen years old," and "10 being that the pain is so excruciating that you have to go the emergency room in an ambulance." (Tr. 38.)  Riser provided that her shoulder pain was a seven, her neck pain a nine, low-back pain an eight, and knee pain also an eight. (Tr. 38-39.) Riser testified that she was taking Vicodin, Gabapentin (i.e., Neurontin), and Methocarbamol for her pain. (Tr. 35.) She also provided that she was taking amitriptyline as a sleep aid. (Tr. 37-38.)

The ALJ also inquired into Riser's ability to function. Riser stated that she could sit for "[p]robably, like, about, like 30 minutes." (Tr. 39.) When asked how long she could stand, Riser said "Probably about, like five minutes, or . . . something like that." (*Id.*) Riser stated that she could walk about a half block. (*Id.*) She said that she could carry a gallon of milk with her right hand, but not with her left. (*Id.*) The ALJ also inquired into Riser's activities of daily living:

> [ALJ:] Get dressed by yourself?
> [RISER:] Yes.
> Q In and out of shower by yourself?
> A Yes.
> Q You cook?
> A No, not anymore.
> Q Okay. Who cooks at home?
> A My mother cooks a little, and my oldest son, I'm teaching him, but he's not listening.
> Q What about go grocery shopping?
> A My oldest son.
> Q Dishes, bed?
> A Oldest son.
> Q Same thing with the housework?
> A Yeah, he helps out with all that. He does all that.

(Tr. 40-41.) Riser testified that she had gained about 40 pounds in the two years preceding the hearing because her injuries prevented her from being active. (Tr. 30.)

12

The ALJ also solicited testimony from a vocational expert to determine whether there would be jobs available for a hypothetical person with functional limitations that the ALJ thought were comparable to Riser's. In particular, the ALJ asked the expert to consider a hypothetical individual of Riser's age, education, and work experience who was capable of "light" work with the following additional limitations: no climbing ladders, ropes, or scaffolds; only "occasional" climbing of ramps or stairs; only "occasional" stooping, crouching, kneeling, and crawling; only "occasional" rotation, flexion, and extension of the neck; only "occasional" overhead reaching with the left arm (but "frequent" with the right); and no work with hazardous machinery or at unprotected heights. (Tr. 45.) The ALJ additionally limited the hypothetical person to "simple work as defined in the [Dictionary of Occupational Titles] as [having Specific Vocational Preparation] levels 1 and 2, routine and repetitive tasks with only occasional decision making; only occasional changes in the work setting; and no strict production quota with an emphasis on a per-shift basis rather than a per-hour basis; with only occasional interaction with the general public, co-workers, and supervisors." (Tr. 45.) The expert testified that the hypothetical person could work as an inspector, tester, and sorter. (Tr. 45.)

The ALJ then asked the vocational expert to consider a second hypothetical individual with the same limitations as the first, except that the second individual was limited to "sedentary" exertion. (Tr. 46.) The expert responded:

> We could be looking at those jobs, for example, as a hand packager. Now, in the DOT, they list the physical demands for this as medium, but, in my experience, there are sedentary hand packaging positions. . . . We'd be looking at about 1,000 jobs in the state of Michigan, about 8,000 in the country.

(Tr. 46.)

13

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the

14

[Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

In a June 13, 2011 opinion, the ALJ applied this five-step framework and concluded that Riser was not disabled. In particular, at step one, he found that Riser had not engaged in substantial gainful activity since her alleged disability onset date of May 12, 2009. (Tr. 14.) At step two, he found that Riser had the following severe impairments: "disorder of the back and neck, degenerative joint disease of the left knee, status post left shoulder rotator cuff repair, depression, and obesity." (*Id.*)[4] Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 15.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with the ability to

> lift up to 10 pounds occasionally; she can never climb ladders/ropes/scaffolds/ramps/stairs; she can occasionally stoop, crouch, kneel, and crawl; she is capable of occasional rotation, flexion, or extension of the neck; she can . . . frequently perform overhead reaching with the right upper extremity and occasional overhead reaching with the left upper extremity; she must avoid all use of hazardous machinery and exposure to unprotected heights; work is limited to simple as defined in the DOT as SVP levels 1 and 2, routine and repetitive tasks; work is limited to a low stress job, defined as having only occasional decision making required, only occasional changes in the work setting, and no production quotas emphasis on a per shift rather than per hour basis; and only occasional interaction with the general public, coworkers, and

---

[4]Riser's appeal to this Court does not challenge the ALJ's evaluation of her mental impairments. In July 2010, however, Dr. Atul Shah, a psychiatrist, evaluated Riser for DDS. (Tr. 297-99.) Riser reported that she "ha[d] been hearing voices and noises and seeing shadows off and on for the last few years." (Tr. 298.) She felt as though people were "watching her, staring at her, looking at her, and following her." (*Id.*) Dr. Shah concluded, "Based on today's evaluation, this claimant has moderate to severe functional impairment of occupational activity because of major depression with psychotic features, partially treated and Trichotillomania, which interferes with her interactions with the public, coworkers and family members. She is subject to relapses in view of the lack of psychiatric intervention." (Tr. 299.)

supervisors.

(Tr. 16.) At step four, the ALJ found that Riser was unable to perform any past relevant work. (Tr. 19.) At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Riser's age, education, work experience, and residual functional capacity. (Tr. 20.) The ALJ therefore concluded that Riser was not disabled as defined by the Social Security Act from the alleged onset date through the date of his decision. (Tr. 20.)

Following the ALJ's decision, Riser sought further administrative review. (*See* Tr. 1.) On January 12, 2013, the Social Security Appeal's Council denied Riser's request. (Tr. 1.) Accordingly, the ALJ's decision became the final decision of the Commissioner of Social Security. Riser then filed this lawsuit to challenge the Commissioner's decision.

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also

supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV.  ANALYSIS

Riser asserts that the ALJ committed two errors in concluding that she was not disabled. She says the "ALJ's credibility determinations are not supported by substantial evidence, and his [residual functional capacity] assessment should be reevaluated accordingly." (Pl.'s Mot. Summ. J. at 10.) Riser also claims that the number of hand-packager positions identified by the vocational expert, 1,000 in Michigan and 8,000 nationally, are too few to support the ALJ's step-five conclusion that a significant number of jobs were available to her. (*Id.* at 13.) The Court considers these two claims of error in turn. The first warrants remand; the second, while close, does not.

17

**A. The ALJ's Credibility Assessment**

The ALJ's primary assessment of Riser's credibility was as follows:

> The claimant alleges that she is disabled because of neck pain, back pain, shoulder pain, and knee pain. The claimant's medical scans do show that the claimant has cervical and lumbar disc disorders. . . . *The claimant continues to have back and neck pain, but the claimant's physician has only prescribed physical therapy and medication. None of the claimant's medical records indicate that the claimant is a candidate for back or neck surgery.* The claimant continues to complain of knee pain, but medical scans do not show evidence of significant degeneration. The claimant's physician has ordered conservative treatment with injections, therapy, and pain medication. . . . *The claimant's doctor has indicated that her ADLs are performed independently, but the claimant alleges she has problems with her ADLs.* The undersigned finds that the claimant's testimony was exaggerated and the tests and studies do not support her allegations. Her physician indicated that she needed only conservative treatment. This evidence is contrary to the claimant's allegations of limitation and it undermines her credibility.

(Tr. 18 (emphases added).)

Riser challenges two of the above justifications for finding her allegations not credible. (Pl.'s Mot. Summ. J. at 10.) She says that the ALJ erroneously concluded that there was no indication in the record that she was a candidate for neck surgery. (*See* Pl.'s Mot. Summ. J. at 10-11.) Riser also claims that the ALJ erred in finding an inconsistency between her testimony about her activities of daily living and her reports about those activities that she provided to her physicians. (*See id.* at 12-13.) The Court considers these claims in turn and concludes that the two rationales Riser challenges are not supported by substantial evidence. *Cf. Hipps v. Comm'r Soc. Sec.*, 73 F. App'x 822, 824 (6th Cir. 2003) ("Credibility determinations regarding a claimant's subjective complaints of pain rest with the ALJ and cannot be overturned on appeal if reasonable and supported by substantial evidence.").

18

*1. The ALJ Erred in Concluding that No Records Indicated that Riser Was a Candidate for Neck Surgery*

The Court agrees with Riser that the ALJ's statement, "[n]one of the claimant's medical records indicate that the claimant is a candidate for back or neck surgery," (Tr. 18) was made in error. Contrary to this finding, in August 2010, Dr. Diaz stated: "I believe Ms. Riser would benefit from a radical anterior discectomy with arthrodesis and instrumentation at C5-C6 . . . ." (Tr. 321.) Then, in September 2010, Dr. Grias noted, "Dr. Diaz did recommend surgery, but she is holding off for now since she is getting her shoulder [surgery] done." (Tr. 325.) And, in October 2010, Dr. Diaz noted "discectomy (to be scheduled)," and that, after surgery, he would determine when Riser could return to work. (Tr. 328.) Accordingly, several medical records indicated that Riser was a candidate for neck surgery.

Although the Commissioner appears to concede this fact, she counters that "the ALJ did not harmfully err in concluding that the overall record evidence did not indicate she was a surgical candidate for back and neck issues." (Def.'s Mot. Summ. J. at 11; *see also id.* at 12 ("[T]he ALJ did not err harmfully in finding that the medical record as a whole did not indicate Plaintiff was a candidate for surgery . . . .").) This argument is unpersuasive.

Although the Commissioner uses the words "harmfully err," a careful parsing of her argument reveals that she does not claim that the ALJ's finding was in error but the error was not harmful. Instead, the Commissioner attempts to reformulate the ALJ's statement such that it is not even erroneous. In particular, by using the phrases "in concluding" and "in finding," the Commissioner claims that the ALJ "conclud[ed] that the overall record evidence" or "[found] that the medical record as a whole" did not indicate Riser was a candidate for neck surgery. (*See* Def.'s Mot. Summ. J. at 11, 12.) But that is not what the ALJ concluded or found. Instead, the ALJ

19

concluded, "None,"—i.e., not one—"of the claimant's medical records indicate that the claimant is a candidate for back or neck surgery." (Tr. 18.) This statement was plainly error.

Although the Commissioner cannot retroactively recast the ALJ's rationale to fix an error, *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 93-94 (1943), even assuming that the ALJ did in fact say that the record as a whole did not indicate that Riser was a candidate for surgery, this claim lacks substantial evidentiary support. On one side of the scale rests Dr. Diaz's opinion. Dr. Diaz was a neurosurgeon. He examined Riser on several occasions. He was also familiar with Riser's treatment history. And he reviewed two different MRIs of Riser's cervical spine. In short, Dr. Diaz's expert opinion was grounded in considerable knowledge of Riser's condition. Thus, his opinion weighs heavily in favor of a finding that Riser was a candidate for surgery.

The Commissioner cites three pieces of evidence, but none tip the scales back very far. She first points out that, when Dr. Diaz noted that Riser would benefit from surgery, he added that Riser was "not interested in pursuing surgery." (Def.'s Mot. Summ. J. at 11.) The Commissioner implies that this suggests that Riser's pain was not as severe as she alleged. (*Id.* at 11-12.) Even if true, this does not substantially detract from the fact that it was a neurosurgeon's medical opinion that surgery "would benefit" Riser. Indeed, Dr. Diaz maintained that neck surgery was to be scheduled even after Riser had elected to undergo shoulder surgery before neck surgery. (*See* Tr. 328.)

Further, the Commissioner's argument overlooks a ready explanation for Riser's hesitation to undergo cervical-spine surgery. *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 507 (6th Cir. 2013) ("'[A]lthough a conservative course of treatment can undermine allegations of debilitating pain, such fact is not a proper basis for rejecting the claimant's credibility where the claimant has a good reason for not seeking more aggressive treatment.'" (quoting *Carmickle v. Comm'r*, 533 F.3d

20

1155, 1162 (9th Cir. 2008))). A "radical anterior discectomy with arthrodesis and instrumentation at C5-C6" is undoubtedly more of an undertaking than shoulder surgery, and shoulder surgery had the potential to relieve some of Riser's pain and reduce her functional limitations. This is not merely speculation but was reflected in the record. After her physicians had recommended neck and shoulder surgery, Riser mentioned the two procedures to Meeron while expressing "concern[] about the seriousness" of the neck surgery. (Tr. 352.) And in his operative report, Dr. Mendelson explained that it was not always clear which of Riser's two upper-body conditions contributed more to her pain:

> After an extensive period of physical therapy, [Ms. Riser] failed to make significant progress of her shoulder. We did at that point recommended arthroscopy to her. She was also found to have a neck condition for which she was seeing Dr. Diaz and initially, we did recommend that she pursue treatment with Dr. Diaz first. There is a lot of overlap at times ____ [*sic*] it is not always a simple matter to distinguish between the 2 of these. She initially was planning to have Dr. Diaz . . . do surgery on her. However, she felt that she could not continue with the persistent shoulder pain and elected to undergo ____ [*sic*].

(Tr. 342.) Given the "overlap" between the two conditions, it was entirely reasonable for Riser to have elected what she believed was less invasive surgery, in hopes that the procedure might obviate the need for something more "serious[]."

Next, the Commissioner says that, despite making similar examination findings in July and August 2010, Dr. Diaz did not mention surgery at the July 2010 exam as he did in August. (Tr. 12.) The Commissioner implies that the absence of new examination findings in August 2010 calls into question the basis for Dr. Diaz's belief that Riser would benefit from surgery. (*See* Def.'s Mot. Summ. J. at 12.) But the Commissioner's focus on exam findings ignores the fact that between the July and August 2010 exams, Riser had undergone a second MRI. (Tr. 316-17.) This second MRI

21

provided Dr. Diaz with new information. The August 2009, MRI stated that there was some impingement of the ventral cord at C4-5 but that there was no stenosis of the neural foramen at any of C3-4, C4-5, or C5-6. (Tr. 248.) In contrast, the July 2010 MRI showed "mild" bilateral foraminal stenosis at C3-4, "mild" left-sided foraminal stenosis at C4-5, "mild" impingement of the ventral cord surface at C5-6, and "left-sided foraminal stenosis" at C5-6. Notably, at her August 2010 visit, Dr. Diaz said that Riser's updated MRI showed a "herniated disc at C3-C4, C4-C5, and C5-C6, *largest at C5-C6 with some encroachment in the canal*." (Tr. 321 (emphasis added).) Not coincidently, Dr. Diaz's surgery recommendation was "radical anterior discectomy with arthrodesis and instrumentation *at C5-C6*." (*Id.* (emphasis added).) Given the updated objective information available to Dr. Diaz at the August 2010 appointment, the fact that he had not recommended surgery in July 2010 does little to undermine his belief that Riser would benefit from surgery.

The Commissioner next argues that "Dr. Diaz's surgery recommendation was based on his conclusion that physical therapy had not resolved [Riser's] symptoms (Tr. 319). Yet this is not consistent with Plaintiff's physical therapist notes, which documented continuous improvement and at least temporary remissions (Tr. 204, 353)." (Def.'s Mot. Summ. J. at 12.) In other words, the Commissioner implies that Dr. Diaz's belief about the benefits of surgery was based on misinformation about the effectiveness of physical therapy.

As an initial matter, the Commissioner's premise is questionable. In support of her claim, the Commissioner, apparently treating Riser's therapy and chiropractic notes as one, relies on Riser's chiropractic treatment during the second-half of 2010 and early 2011. (Tr. 353.) It is true that Meeron's cervical- and lumbar-spine evaluations revealed improvement over time. (*Compare* Tr. 241, *with* Tr. 353.) But the Commissioner apparently overlooks the fact that in December 2010,

22

Meeron noted, "I see her on a very intermittent basis as treatment does provide her with some temporary remission. We have seen changes overall from date of initial visit, however *she does continue to have significant flare ups*. I will continue treating the patient as long as she does continue to experience positive outcome. *I do feel her condition is chronic however*." (Tr. 353 (emphasis added).) And in February 2011: "[Ms. Riser] also indicates that her and Dr. Diaz . . . are discussing the possibility of surgical therapy. *I explained to her that she needs more than what my office can provide* and that I would continue seeing her here periodically as long as she was experiencing positive outcome following visits at my office." (Tr. 354 (emphasis added).)

And even if Riser's therapy notes did document "continuous improvement" as the Commissioner claims, this does not mean that Riser improved to the point of no longer needing surgery. Although Riser's conditions improved from physical therapy, those notes certainly do not show that her cervical-spine (or other) symptoms resolved from therapy. And Dr. Diaz's belief that Riser would benefit from surgery was based only in part on his understanding about the effectiveness of physical therapy. He was additionally aware that other treatment had proven ineffective: "She has been going through physical therapy and receiving medication, injections, exercises, and her symptoms have not resolved." (Tr. 319.) Dr. Diaz had also examined Riser (on multiple occasions) and observed that she had a decreased range of motion in her cervical spine. (*Id.*) And perhaps most significantly, he reviewed two MRIs, the second of which showed stenosis at multiple levels. (Tr. 317, 321.) It was undoubtedly based on all of this that Dr. Diaz concluded that Riser "would benefit" from neck surgery.

In short, the ALJ's plain conclusion that "[n]one of the claimant's medical records indicate that the claimant is a candidate for back or neck surgery" (Tr. 18) is directly contrary to the record.

23

And even accepting the Commissioner's characterization of the statement, the overall record does not show that Riser was not a candidate for neck surgery. The ALJ therefore erred.

Before determining whether this error was harmful, the Court turns to Riser's claim that the ALJ committed a second error in assessing her credibility.

> ### 2. The ALJ Erred in Concluding that Riser's Reports About Her Activities of Daily Living Were Inconsistent

As quoted above, the ALJ also discounted Riser's credibility because "[t]he claimant's doctor has indicated that her [activities of daily living ("ADLs")] are performed independently, but the claimant alleges she has problems with her ADLs." (Tr. 18.) Riser says that "[i]n reality," her "testimony was completely consistent with that of her doctor." (Tr. 12.) Riser then goes on to compare her hearing testimony about her ADLs with her report about her ADLs to Dr. Grias. (Pl.'s Mot. Summ. J. at 12.)

It is unclear, however, whether the inconsistency the ALJ identified was between Riser's hearing testimony and her doctor's findings. Based on an earlier portion of the ALJ's narrative, it appears that the ALJ found an inconsistency between Riser's self-completed function report and her report to Dr. Grias:

> On the Function Report, the claimant indicated that she had some problems with her personal care due to back pain, neck pain, shoulder pain, and arm pain (3E). However, the claimant reported to her doctor that she was independent with her basic and light advanced ADLs (1F/2). She indicated that she only needed assistance with heavier and advanced ADLs. Her physicians have not limited her from performing her basic ADLs.

(Tr. 15.)

Even granting considerable deference to the ALJ, the Court fails to appreciate this inconsistency. On the function report, there was a question titled "Personal Care" asking Riser to

24

check a box if there was "no problem with personal care." (Tr. 172 (capitalization altered).) Riser

did not check that box, and she then provided that dressing and bathing were "affect[ed]" by "lower

back pain," caring for her hair affected by "neck [and] shoulder pain," feeding herself by "left arm

pain," and using the toilet by "back pain." (Tr. 172.) The ALJ's reference to Exhibit "1F/2" is a

reference to Dr. Grias's April 16, 2010 notes. There, Dr. Grias wrote, "She is independent in basic

and light advanced ADLs. Her elder son and younger son help with heavier advanced ADLs. She

is not driving." (Tr. 197.) There is no inconsistency between Riser's two reports. On her functional

report, she provided that she had pain when performing basic ADLs. She did not say that she needed

help with them. To Dr. Grias, Riser said she was independent with basic ADLs; she did not say that

she did not have pain when performing them. The inconsistency the ALJ identified is, therefore,

non-existent.

The Commissioner resists this result by asserting that Riser "alleged that she relied on her

son for all household tasks" and contrasting that allegation with her report to Dr. Grias. (Def.'s Mot.

Summ. J. at 12.) The Commissioner, however, does not direct the Court to where in the record Riser

"alleged that she relied on her son for all household tasks." (*See id.*) To the extent that she references

Riser's function report, that reliance is misplaced. There, Riser did not say that she "relied on her

son for all household tasks." Instead, she said, "My son does everything for ME. That I can no

longer do." (Tr. 73.)

At the administrative hearing, Riser and the ALJ had this exchange:

> [ALJ:] [Who goes] grocery shopping?
> [RISER:] My oldest son.
> Q Dishes, bed?
> A Oldest son.
> Q Same thing with the housework?
> A Yeah, he helps out with all that. He does all that.

25

(Tr. 40-41.) These examples do not equate to "everything." And, as noted, it is not clear that the ALJ relied on this testimony when he found that Riser inconsistently reported her activities of daily living. (*See* Tr. 15, 18.) In any event, Riser's statement that her son "does all that" is vague. As such, it does not substantially undermine her report to Dr. Grias that "[s]he [was] independent in basic and light advanced ADLs" but her sons "help[ed] with heavier advanced ADLs." (Tr. 197.)

Accordingly, the Court concludes that substantial evidence does not support another of the ALJ's rationales for discounting Riser's testimony. The question thus becomes whether the ALJ's two errors in assessing Riser credibility were harmless.

### 3. Legal Standard for Determining Whether the ALJ's Errors in Assessing Riser's Credibility Were Harmless

Recently, the Sixth Circuit "ma[d]e explicit what [it had] previously adopted by implication: harmless error analysis applies to credibility determinations in the social security disability context." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). In *Ulman*, the ALJ erroneously found that the claimant had fallen off of a ladder in 2006, when in fact the accident had occurred in 2001. *Id.* at 711. The error was significant because the ALJ's credibility assessment rested in part on it: "The fact that [the claimant] was climbing a ladder [in 2006] is not consistent with being disabled prior to December 2003 and brings her credibility into question." *Id.* at 712. On appeal to federal court, a magistrate judge believed that the error was harmless:

> The ALJ's observation that disabled individuals generally do not climb ladders is misplaced, but the error is harmless. Substantial evidence is the applicable standard of review, not perfection. The ALJ found that plaintiff's testimony regarding the intensity, persistence, and limiting effects of her symptoms was not fully credible because it was inconsistent with the objective evidence and the opinions of her treating pain specialist, Daniel Mankoff, M.D. There is more than substantial evidence supporting the ALJ's

26

credibility determination.

*Id.* at 713. The district court adopted the magistrate judge's recommendation: "Plaintiff's argument would be persuasive if the ALJ had based his credibility finding solely or primarily on the factual error identified by Plaintiff. However, as the Magistrate Judge details in the R & R, the ALJ analyzed at length other, objective evidence in support of his credibility determination." *Id.*

On appeal to the Sixth Circuit, Ulman, relying on *S.E.C. v. Chenery Corp.*, 318 U.S. 80 (1943), for the proposition that "federal agency action must be based upon what it did, not by what it might have done," argued that "the magistrate judge (and the district court by extension) erred because he failed, as did the ALJ, to identify precisely what objective medical evidence other than the fall from the ladder called her credibility into question." *Ulman*, 693 F.3d at 713-14 (internal quotation marks omitted). The Sixth Circuit rejected this argument, explaining that "the Commissioner is not attempting to offer a post hoc-justification of agency action by invoking the harmless error argument" but was "simply saying that the ALJ cited 'substantial evidence' to support his conclusion regarding claimant's credibility even if we discount his reliance upon the fall from the ladder." *Id.* at 714. The Court emphasized, "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess." *Id.*; *see also Ulman*, 693 F.3d at 714 ("'[S]o long as there remains substantial evidence supporting the ALJ's conclusions on credibility and the [ALJ's] error does not negate the validity of the ALJ's ultimate credibility conclusion, such is deemed harmless and does not warrant reversal.'" (quoting *Carmickle*, 533 F.3d at 1162)). The Sixth Circuit thus concluded: "With the exception of Ms. Ulman's fall from the ladder, the ALJ's decision carefully parses all of the medical records and accords them fair weight. And, those records support a finding of no disability. [One of the Ulman's physicians] stated that

claimant could return to work with the very restrictions adopted by the ALJ in his hypothetical to the vocational expert. Given our highly deferential standard of review, we must affirm the denial of benefits." *Id.*

*Ulman* therefore suggests that, in reviewing for harmless error in the context of an ALJ's credibility assessment, this Court should determine whether the ALJ "cited" substantial evidence to support his conclusion regarding Riser's credibility after discounting for his two erroneous findings. *See New v. Colvin*, No. 12-219-ART, 2013 WL 4400522, at *6 (E.D. Ky. Aug. 13, 2013) (citing *Ulman* and providing, "The harmless error analysis proceeds in two steps: 1) what was the ALJ's credibility finding, and 2) leaving the problematic reasoning aside, did the rest of the ALJ's reasons support that finding?").

### 4. The ALJ's Errors in Assessing Riser's Credibility Were Not Harmless

Although the ALJ's his credibility analysis did not separately address Riser's various assertions, or explicitly state how much he was discounting them, the record along with the ALJ's narrative is sufficient for the Court to determine that the ALJ either rejected or severely discounted Riser's sitting, standing, and walking limitations. Riser testified that she could sit for about 30 minutes, stand for about five minutes, and walk about a half-block. (Tr. 39.) But the ALJ's residual functional capacity assessment (and corresponding hypothetical to the vocational expert) limited Riser to "sedentary" work (with additional limitations that did not alter the sitting, standing, and walking requirements of "sedentary" work). Sedentary work requires "occasional" standing or walking, meaning standing or walking "very little up to one-third" of an eight-hour workday and sitting the remainder, generally "6 hours of an 8-hour workday." S.S.R. 96-9p, 1996 WL 374185, at *3; *see also* 20 C.F.R. § 404.1567; S.S.R, 83-10, 1983 WL 31251, at *5. The ALJ, therefore,

28

implicitly rejected, or at least severely discounted, Riser's testimony about sitting, standing, and walking.

So the Court turns to whether the ALJ cited sufficient record evidence for doing so. In making this determination, the Court omits the ALJ's findings that no records indicated that Riser needed neck surgery and that Riser inconsistently reported her ADLs. The ALJ's narrative discusses the following remaining evidence arguably relevant to Riser's testimony: (1) Riser was independent in her basic and light advanced ADLs (Tr. 15, 18); (2) at the emergency room following the bus accident, Riser was diagnosed with left-arm and left-knee contusions (Tr. 17); (3) an EMG of Riser's cervical spine was negative (Tr. 17); (4) Riser "reported no improvement with therapy," but her "therapy records indicated . . . modest improvements" (Tr. 17); (5) Riser was "given injections with good results" (Tr. 18); (6) Riser had shoulder surgery and her surgeon indicated that she "made good progress" (Tr. 18); (7) scans of Riser's knees did not show significant degeneration and Riser's physicians treated her knee with "conservative" treatment such as injections, therapy, and pain medication (Tr. 18); and (8) Riser's "physician indicated that she needed only conservative treatment" (Tr. 18).

Only one of these eight rationales supports discounting Riser's testimony regarding her ability to sit, stand, or walk. The ability to complete basic or light advanced ADLs—without any description of these tasks—is not inconsistent with being able to sit for 30 minutes, stand for five, or walk a half-block. As for Riser's emergency-room diagnoses, they were superseded by more informed diagnoses. The ALJ was correct that an EMG of Riser's cervical spine was negative, but MRIs provided objective evidence of mild stenosis at C3 through C5 and "canal and left-sided foraminal stenosis" (without the "mild" descriptor) at C5-C6. As for the ALJ's statement that Riser

29

"reported no improvement with therapy," the statement is inaccurate; Dr. Grias actually wrote, "*Since I last saw [Ms. Riser]*, she has been doing therapy, but she notes no *significant* improvement. (Tr. 310 (emphasis added).) The fact that Riser did not have "significant" improvement in a seven-week span is not inconsistent with the fact that she may have had modest improvements from therapy overall. As for Riser's injections, it appears that they offered only temporary relief, and, in any event, the injections were for Riser's shoulder and knee—not her cervical spine. Regarding the ALJ's remark that Riser's "physician indicated that she needed only conservative treatment," that claim does not apply to Riser's surgically-repaired shoulder or her neck, for which Dr. Diaz thought surgery was appropriate.

That leaves the ALJ's claim that objective testing on Riser's knee was largely negative and that Riser's "physician . . . ordered conservative treatment with injections, therapy and pain medication" for her knee. (Tr. 18.) This assertion more substantially calls Riser's credibility into question. The ALJ was correct that MRIs of Riser's knee were negative, except that, in Dr. Mendelson's opinion, one showed swelling. (*See* Tr. 284, 287, 346.) Yet Riser testified that her knee pain was at the eight-out-of-ten level—only one level below her neck pain and two below the most severe pain possible. (Tr. 38-39.) Moreover, Riser's knee condition was likely a basis for her claim that she could stand for only five minutes and walk only a half-block.

Still, the Court cannot conclude that the ALJ's errors in assessing Riser's credibility were harmless based solely on the fact that the ALJ may have had good reason to question Riser's testimony about her knee. First, although Riser's knee treatment was "conservative" in the sense that she did not have surgery, the ALJ, without explanation, substantially discounted the considerable treatment Riser did receive. Riser underwent physical therapy on her knee to the point where therapy

30

started causing an increase in pain and swelling. (Tr. 310.) Riser used a knee brace, and, at one point, felt that she could not function without it. (Tr. 310.) Riser was prescribed a number of pain medications, including a medication that operated by reducing her immune response in hopes of reducing swelling. (Tr. 285.) When that did not work, Dr. Mendelson prescribed Riser an "Interferential unit," i.e., an electrical stimulator, for her knee. (Tr. 296.) When Riser continued to have knee pain, he provided an injection. (Tr. 329.) This is substantial treatment supporting Riser's claim of severe knee pain. Second, even accepting that Riser was not fully credible regarding her knee condition, this does not directly undermine her testimony about her ability to sit for 30 minutes, a function that was limited primarily by her neck pain. And the fact that Riser arguably exaggerated her knee pain is not so damaging to her credibility that her testimony regarding her neck pain or her ability to sit was reasonably rejected.

In sum, leaving aside the ALJ's two erroneous bases for discounting Riser's credibility—that no records indicated that she was a candidate for neck or back surgery and that she inconsistently reported her activities of daily living—the other rationales the ALJ provided, and the other evidence he cited, do not support discrediting at least Riser's allegation that she could sit for only 30 minutes. Notably, the core of the ALJ's credibility assessment was his belief that Riser required only conservative treatment: "Her physician indicated that she needed only conservative treatment. This evidence is contrary to the claimant's allegations of limitation and it undermines her credibility." (Tr. 18.) Accordingly, the ALJ's errors cannot be deemed harmless. *See Allen v. Barnhart*, 357 F.3d 1140, 1144 (10th Cir. 2004) ("[A]s a court acting within the confines of its administrative review authority, we are empowered only to review the ALJ's decision for substantial evidence and, accordingly, we are not in a position to draw factual conclusions on behalf of the ALJ."); *New*, 2013

31

WL 4400522, at *6 ("[L]eaving the problematic reasoning aside, did the rest *of the ALJ's reasons* support [the ALJ's credibility] finding?" (emphasis added)).

### B. Jobs in Significant Numbers

Riser also claims that the ALJ erred at step five. (Pl.'s Mot. Summ. J. at 13-16.) In particular, she asserts that 1,000 hand-packager jobs in Michigan, or 8,000 such jobs nationwide, are so few that substantial evidence does not support the ALJ's conclusion that she was capable of "other work that exists in significant numbers in the national economy" (Tr. 20). (*See* Pl.'s Mot. Summ. J. at 13-14.)

This claim is not moot despite the foregoing recommendation to remand to reassess Riser's credibility. As the Court understands Riser's second argument, she claims that even if the ALJ's findings up to step five are without error (including the ALJ's credibility assessment), reversal is nonetheless required because the ALJ erred at step five. If this argument is correct, an award of benefits would be proper.

The Social Security Act provides that a claimant is disabled if her impairments prevent her from returning to her past relevant work and, given her age, education, and work experience, she cannot engage in other substantial gainful "work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The Act further provides that "'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.* Thus, for Riser to succeed in demonstrating that the ALJ erred at step five, she must show that both 1,000 jobs in Michigan *and* 8,000 jobs nationally are not significant numbers. *See Beltran v. Astrue*, 700 F.3d 386, 390 (9th Cir. 2012) ("If we find either of the two numbers 'significant,' then we must uphold the ALJ's decision (citing 42 U.S.C. §

32

423(d)(2)(A))).

The leading Sixth Circuit case on the meaning of the phrase "work which exists in significant numbers" is *Hall v. Bowen*, 837 F.2d 272 (6th Cir. 1988). There, the ALJ found that 1,350 jobs in a nine-county area in Ohio "represented work in significant numbers." *Id.* The district court disagreed, but the Sixth Circuit reversed. In doing so, it explained:

> We are not blind . . . to the difficult task of enumerating exactly what constitutes a "significant number." We know that we cannot set forth one special number which is to be the boundary between a "significant number" and an insignificant number of jobs. The figure that the ALJ here found is not that magic number; the 1350 figure is to be viewed in the context of this case only. A judge should consider many criteria in determining whether work exists in significant numbers, some of which might include: the level of claimant's disability; the reliability of the vocational expert's testimony; the reliability of the claimant's testimony; the distance claimant is capable of travelling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on.

*Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988). "[U]ltimately," the decision is left "to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation." *Id.*

Before examining how these factors apply to the facts of this case, the Court emphasizes that the numbers at issue undoubtedly border on insignificant. Courts have found that quantities greater than 8,000 jobs nationally are insignificant. *See Valencia v. Astrue*, No. 11-06223, 2013 WL 1209353, at *18 (N.D. Cal. Mar. 25, 2013) ("114 regional or 14,082 national positions does not constitute a significant number as defined in 42 U.S.C. § 423(d)(2)(A)."); *West v. Chater*, No. C-1-95-739, 1997 WL 764507, at *3 (S.D. Ohio Aug. 21, 1997) ("In this case, the Court finds as a matter of law that 100 jobs locally, 1,200 jobs statewide and 45,000 jobs nationally do not constitute a significant number of jobs under 42 U.S.C. § 423(d)(2)(a)."); *Tapp v. Sec'y of Health & Human*

33

*Servs.*, No. 1:90CV1214, 1991 WL 426310, at *1 (N.D. Ohio July 18, 1991) (finding 30,000 jobs nationally insignificant).

Other case law, however, more strongly supports the vocational expert's regional figure of 1,000 jobs in Michigan. *See Trimiar v. Sullivan*, 966 F.2d 1326, 1330-31 (10th Cir. 1992) (finding that ALJ applied *Hall* factors and holding that 650 to 900 jobs in Oklahoma significant); *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997) (finding that 200 jobs in Iowa, and 10,000 jobs nationally, constituted significant numbers where expert provided that those figures were "merely representative of a larger category of jobs that [the claimant] could perform"); *Hoffman v. Astrue*, No. C09-5252, 2010 WL 1138341, at *7 (W.D. Wash. Mar. 19, 2010) (holding that 150 jobs in Washington and 9,000 jobs nationally constituted significant numbers). Additional cases, although not involving a state-wide figure, further suggest that 1,000 jobs in Michigan can constitute a significant number of jobs. *See Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 375 (6th Cir. 2006) ("While there are only 107,826 assembler jobs in the United States, 870 of the jobs are concentrated in Martin's geographic region. Contrary to Martin's position, 870 jobs can constitute a significant number in the geographic region."); *Barker v. Sec'y of Health & Human Servs.*, 882 F.2d 1474, 1479 (9th Cir. 1989) (holding, in the alternative, that 1,266 jobs in the Los Angeles/Orange County area was significant); *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988) (finding that 1,350 jobs in nine-county area of Ohio was significant); *Craigie v. Bowen*, 835 F.2d 56, 58 (3d Cir. 1987) (providing that 200 jobs in the claimant's "region" was a significant number); *Uravitch v. Heckler*, No. 84-1619, 1986 WL 83443, at *1 (D. Ariz. May 2, 1986) (finding that around 150 to 240 jobs in claimant's county significant). Still, the 1,000-job figure is not beyond reproach. *West*, 1997 WL 764507, at *3 (finding 1,200 jobs in Ohio insignificant); *Tapp*, 1991 WL

34

426310, at *1 (finding 1,500 to 2,000 jobs in Ohio insignificant).

Thus, although Riser's challenge to the ALJ's step-five finding is very close, the Court believes that, under the assumption that the ALJ findings were correct up to step five, the *Hall* factors and foregoing precedent suggest that 1,000 hand-packager jobs in Michigan constitute a "significant number" in this case. Given Michigan's population distribution and the nature of the job, it is a reasonable assumption that most, or at least hundreds, of the 1,000 jobs the vocational expert identified are located in southeastern Michigan. And Riser lives in Detroit. (Tr. 29.) *Cf. Waters v. Sec'y of Health & Human Servs.*, 827 F. Supp. 446, 448-50 (W.D. Mich. 1992) (concluding that 1,000 jobs in Michigan did not constitute a significant number where it could not be "seriously disputed that the vast majority of these 1,000 jobs exist in the greater Detroit area" which was 500 miles away from plaintiff's residence). Further, under the assumption that the ALJ's findings up to step five are correct, Riser has the ability to sit for six hours and walk or stand for two hours in an eight-hour day and can rotate, flex, and extend her neck for up to one-third of an eight-hour day. (Tr. 16.) As such, the ALJ could have reasonably thought that Riser could drive to a nearby job or use public transportation. Additionally, given the vocational expert's education and experience (Tr. 126; *see also* 43-44), his review of the record (Tr. 43), and his careful consideration of all the limitations the ALJ provided (*see* Tr. 45-46), there are good reasons to consider the figures he provided accurate. Notably too, the vocational expert here hinted that there were other jobs besides hand packager that would be available to Riser: "We could be looking at those jobs, *for example*, as a hand packager." (Tr. 46 (emphasis added).) Finally, Riser has cited no case holding 1,000 jobs in Michigan to be insignificant on similar facts. *Cf. Troyer v. Comm'r of Soc. Sec.*, No. 1:12CV759, 2013 WL 4954883, at *3-5 (W.D. Mich. Sept. 12, 2013) (remanding for ALJ to

35

determine whether 1,000 in Michigan and 33,000 nationally constituted a significant number of jobs, where ALJ had erroneously relied on vocational expert's job figures in response to a hypothetical that did not correspond to the claimant's residual functional capacity); *Waters*, 827 F. Supp. at 448-50. Indeed, Riser has made no attempt to apply the *Hall* factors to this case. In all then, Riser has failed to persuade the Court that 1,000 jobs in Michigan is so few that the ALJ unreasonably concluded that there were a significant number of jobs available to her.

## V. CONCLUSION AND RECOMMENDATION

Although this Court has determined that the ALJ erred in assessing Riser's credibility, "[a] judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994). Upon a careful review of the administrative record, this Court believes that the record is not so one-sided that it is proper to conclude, in the first instance, that there are no legitimate bases for discounting Riser's allegations that she is disabled. Instead, the Court RECOMMENDS that this case be REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for an ALJ to conduct a proper assessment of Riser's credibility. It follows that Riser's Motion for Summary Judgment (Dkt. 12) should be GRANTED IN PART and the Commissioner's Motion for Summary Judgment (Dkt. 14) should be DENIED.[5]

---

[5]The Court's review of the administrative record revealed no medical expert opinion on whether Riser's physical (as opposed to mental or emotional) impairments medically equaled an impairment found in the Social Security Administration's Listings found at 20 C.F.R. Part 404, Subpart P, Appendix 1. On remand, the ALJ should consider obtaining such an opinion. *See, e.g.*, *Barnes v. Comm'r of Soc. Sec.*, No. 12-15256, 2013 WL 6328835, at *11 (E.D. Mich. Dec. 5, 2013).

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  January 31, 2014

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on January 31, 2014.

s/Jane Johnson
Deputy Clerk

37